USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: ___5/31/20___

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

W. Bradford Blash, *et al.*,

                Plaintiffs,

      –v–

BCS Placements, LLC, *et al.*,

              Defendants.

---

19-cv-6321 (AJN)

OPINION & ORDER

ALISON J. NATHAN, District Judge:

Plaintiffs W. Bradford Blash and Theodore M. Kerr, Jr. initiated this action, invoking the Court's diversity jurisdiction, to enjoin Defendants BCS Placements, LLC and Keith Butler from arbitrating claims they claim are not arbitrable and to obtain other related declaratory relief. Now before the Court is Plaintiffs' motion to preliminarily enjoin the arbitration at issue. For the reasons that follow, Plaintiffs' preliminary injunction motion is DENIED.

I.      BACKGROUND

A.      Factual Background[1]

Plaintiffs owned a controlling interest in Crossbeam Holdings, LLC until it was dissolved on December 28, 2018. Dkt. No. 7-2 ¶¶ 4, 6. Defendant Keith Butler is the Managing Member of Defendant BCS Placements, LLC. Dkt. No. 28 ¶ 3. On November 7, 2006, WFHG Management, LLC, which later became Crossbeam, entered into a placement agreement with BCS. Dkt. No. 7-2 ¶ 7; Dkt. No. 28 ¶ 9. The 2006 agreement was amended on June 1, 2007 to change the compensation payable under it but otherwise remained unchanged. Dkt. No. 7-2 ¶ 8;

---

[1] These facts are drawn from the parties' submissions on the preliminary injunction motion and, unless otherwise noted, are undisputed.

Dkt. No. 28 ¶ 19.  Pursuant to this agreement, BCS was to obtain investors for a real estate fund

operated by Crossbeam.  Dkt. No. 7-2 ¶ 9; Dkt. No. 28 ¶ 10.  Section 19 of this agreement is an

arbitration clause, which provides that:

> Each of the parties hereto has been induced to enter into this letter agreement in reliance upon the waivers of this Section 19, and without those waivers no party would have entered into this letter agreement.
>
> IT IS THE DESIRE AND INTENTION OF EACH OF THE PARTIES HERETO TO AGREE UPON A MECHANISM AND PROCEDURE UNDER WHICH ANY DISPUTES OR DISAGREEMENTS UNDER OR RELATING TO THIS LETTER AGREEMENT WILL BE RESOLVED IN A PROMPT AND EXPEDITIOUS MANNER.  THE PARTIES INTEND THAT SUCH RAPID MECHANISM AND PROCEDURE BE UTILIZED TO RESOLVE ANY AND ALL DISPUTES AND DISAGREEMENTS UNDER OR RELATING TO THIS LETTER AGREEMENT.  ACCORDINGLY, THE PARTIES HERETO AGREE THAT ALL CLAIMS, DISPUTES AND OTHER MATTERS IN QUESTION ARISING OUT OF, OR RELATING TO, THIS LETTER AGREEMENT OR THE PERFORMANCE THEREOF, INCLUDING QUESTIONS AS TO WHETHER A MATTER IS GOVERNED BY THIS ARBITRATION CLAUSE, FOLLOWING THE EXPIRATION OF A TWENTY (20) DAY PERIOD, WHICH PERIOD SHALL COMMENCE UPON NOTICE OF SUCH DISPUTE FROM ONE PARTY TO THE OTHER IN ACCORDANCE WITH SECTION 16 ABOVE AND DURING WHICH THE PARTIES SHALL NEGOTIATE IN GOOD FAITH TO RESOLVE SUCH DISPUTE, MAY BE SUBMITTED TO BINDING ARBITRATION IN A LOCATION IN MONTGOMERY COUNTY, MARYLAND, BEFORE A SINGLE ARBITRATOR SELECTED BY THE PARTIES PURSUANT TO THE RULES OF THE AMERICAN ARBITRATION ASOCIATION THEN IN EFFECT FOR THE ARBITRATION OF COMMERCIAL DISPUTES, EXCEPT THAT DISCOVERY SHALL BE GOVERNED BY TITLE 9 OF THE MARYLAND CODE OF CIVIL PROCEDURE.  THE ARBITRATOR SHALL AWARD FEES AND EXPENSES (INCLUDING THE REASONABLE ATTORNEYS' FEES) TO THE PREVAILING PARTY.  THE AWARD RENDERED BY THE ARBITRATOR SHALL BE FINAL AND JUDGMENT MAY BE ENTERED IN ACCORDANCE WITH APPLICABLE LAW AND IN ANY COURT HAVING JURISDICTION THEREOF.  THE EXISTENCE AND RESOLUTION OF THE ARBITRATION SHALL BE KEPT CONFIDENTIAL BY THE PARTIES AND SHALL ALSO BE KEPT CONFIDENTIAL BY THE ARBITRATOR.  NO ARBITRATION PROCEEDINGS HEREUNDER SHALL BE BINDING UPON OR IN ANY WAY AFFECT THE INTERESTS OF ANY PARTY OTHER THAN THE PARTY SEEKING RELIEF OR THE OTHER PARTY WITH RESPECT TO SUCH ARBITRATION.  ANY ARBITRATOR UNDER THIS SECTION 19 SHALL BE AN ATTORNEY HAVING AT LEAST TEN (10) YEARS EXPERIENCE (IN THE TWENTY (20) YEARS IMMEDIATELY PRECEDING

THE ARBITRATION PROCEEDING) IN LEGAL MATTERS PERTAINING TO THE INTERPRETATION AND IMPLEMENTATION OF THE LAWS OF THE STATE OF NEW YORK RELATING TO BROKERAGE AND/OR PLACEMENT AGREEMENTS.  THE PROVISIONS OF THIS SECTION 19 SHALL NOT BE INTERPRETED TO PRECLUDE THE RIGHT OF A MEMBER TO OBTAIN EQUITABLE RELIEF TO ENFORCE HIS, HER OR ITS RIGHTS UNDER THIS AGREEMENT EITHER IN A COURT OF COMPETENT JURISDICITON OR IN AN ARBITRATION PROCEEDING PURSUANT TO THIS SECTION 19.

Dkt. No. 7-3 § 19.

Crossbeam and BCS subsequently entered into another placement agreement on February 1, 2011.  Dkt. No. 7-2 ¶ 10; Dkt. No. 28 ¶ 29; *see also* Dkt. No. 7-5.  Pursuant to this agreement, BCS was to sell limited partnership interests in a new fund being offered by Crossbeam.  Dkt. No. 7-2 ¶ 10; Dkt. No. 28 ¶ 30.  This agreement does not contain an arbitration clause.  *See* Dkt. No. 7-5.

On April 25, 2013, Crossbeam informed BCS that it was terminating its engagement due to BCS's purported failure to provide evidence that it was appropriately registered and compliant with federal and state laws and regulations.  Dkt. No. 7-2 ¶¶ 11–12 ; Dkt. No. 28 ¶ 64; *see also* Dkt. No. 7-6.  BCS contests both that it was obligated to provide such evidence and that it failed to do so.  Dkt. No. 28 ¶ 65.  On November 11, 2015, Mr. Butler sent a letter to Mr. Kerr demanding certain placement fees he said Crossbeam owed BCS.  Dkt. No. 7-2 ¶ 16; Dkt. No. 28 ¶ 69; *see also* Dkt. No. 7-7.  On December 28, 2018, Crossbeam was dissolved.  Dkt. No. 7-8.

Having obtained no resolution of various disputes with Crossbeam, including the payment dispute noted in its November 2015 letter, BCS filed a demand for arbitration with the American Arbitration Association on April 22, 2019.  Dkt. No. 28 ¶ 70; *see also* Dkt. No. ¶ 7-9.  The demand describes BCS's claims against Crossbeam as

Failure to pay fees due to BCS Placements under the terms of its contract.  Taking actions that were premised knowingly on the false accusation that BCS was not registered as a broker dealer with the SEC, FINRA, and the New York State.

> Bringing in another banker, Kirby, to work on an assignment that was exclusive to
> BCS. Defaming BCS in the eyes of New York Life and other insurance companies
> that were prime clients for BCS's business. Failure by the majority of the partners
> of Crossbeam, including New York Life, to control the abusive behavior of their
> partner Richard Devaney.

Dkt. No. 28 ¶ 71. Defendants describe these claims as "breaches of various obligations" under

the 2006 agreement. *Id.* ¶ 72. Plaintiffs, on the other hand, argue that these claims either do not

arise under the 2006 agreement, but rather arise under the 2011 agreement—which does not

contain an arbitration clause—or are time-barred. Dkt. No. 7-1 at 7–8.

### B.   Procedural Background

Plaintiffs filed their Complaint on July 8, 2019. *See* Dkt. No. 1. In Plaintiffs' Complaint,

they seek to enjoin Defendants from arbitrating the claims asserted in the arbitration because, as

discussed above, they assert that these claims do not arise under the 2006 agreement or, if they

do, are time-barred. Plaintiffs filed the preliminary injunction now before the Court on July 22,

2019 to preliminarily enjoin Defendants from arbitrating their claims. *See* Dkt. No. 7.

On November 1, 2019, the Court held a conference on the preliminary injunction motion.

*See* Nov. 1 Conf. Tr. At that conference, Plaintiffs requested discovery from Defendants on the

nature of their claims. *See id.* at 2:23–4:23. Defendants argued that no such discovery was

necessary because there was a threshold legal question regarding who should decide questions of

arbitrability that did not require the resolution of any factual disputes to resolve. *Id.* at 11:6–12.

On the basis of that representation, the Court declined to permit any additional discovery or hold

an evidentiary hearing and determined that it would resolve the preliminary injunction motion on

the papers, unless doing so required resolving a factual issue.[2] *Id.* at 12:16–21. Because the

---

[2] The Court advised the parties that if the preliminary injunction motion could not be decided without resolving
factual issues, it would grant the motion and set a quick schedule to get to final resolution of the matter. *Id.* at
12:16–21.

Court concludes below that resolution of the motion turns only on a threshold legal question, it now decides the motion on the papers.

## II.     LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. NRDC, Inc.*, 555 U.S. 7, 22, 24 (2008). As a general matter, a party seeking a preliminary injunction "must . . . show a likelihood of success on the merits, a likelihood of irreparable harm in the absence of preliminary relief, that the balance of equities tips in the party's favor, and that an injunction is in the public interest." *ACLU v. Clapper*, 804 F.3d 617, 622 (2d Cir. 2015) (citing *Winter*, 555 U.S. at 20). Even if a plaintiff has not demonstrated a likelihood of success on the merits, a preliminary injunction may still be granted if the plaintiff shows "a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in the plaintiff's favor." *Metro. Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152, 156 (2d Cir. 2010) (quotation omitted).

## III.    DISCUSSION

Plaintiffs argue that this Court should preliminarily enjoin the arbitration demanded by Defendants because Defendants' claims are not arbitrable. Defendants argue that Plaintiffs are unable to establish the likelihood of success on the merits or serious questions going to the merits necessary to warrant a preliminary injunction because the question of arbitrability of Defendants' claims is itself arbitrable. The Court agrees with Defendants and concludes that resolution of the threshold question of who determines arbitrability is committed to the arbitrator by the terms of the parties' 2006 agreement. Accordingly, Plaintiffs have failed to establish a likelihood of

success on the merits or serious questions going to the merits, and their preliminary injunction

motion is denied.

###### A.      Choice of Law

As an initial matter, the Court must determine what law applies to this diversity action.

Plaintiffs argue that the Federal Arbitration Act does not govern the 2006 agreement.  Rather,

they argue that New York law governs, pointing to the choice of law clause in the 2006

agreement, *see* Dkt. No. 7-3 § 11, which provides that the agreement shall be governed by, and

construed and enforced in accordance with, the law of the State of New York.  While Defendants

cite to the FAA throughout their opposition, they do not contest Plaintiffs' assertion that New

York law—and not the FAA—applies.[3]  Ultimately, it is immaterial what law applies, because

the Second Circuit has concluded that both federal and New York law "follow[] the same rule"

with respect to the parties' primary dispute: whether they have obligated themselves to arbitrate

the question of arbitrability.  *Shaw*, 322 F.3d at 121; *see also Bolden v. DG TRC Mgmt. Co.,

LLC,* No. 19-cv-3425 (KMW), 2019 WL 2119622, at *4 (S.D.N.Y. May 15, 2019) ("In any

event, even if the FAA did not apply to the APA, New York law would not prohibit arbitration of

Dr. Cook-Bolden's unconscionability claim.  Under New York law, as under the FAA, the

question of arbitrability is an issue generally for judicial determination, unless the parties evince

a clear and unmistakable agreement to arbitrate arbitrability.  For the reasons explained below,

the parties have evinced such an intent here, and therefore arbitration of questions of arbitrability

would also be appropriate under New York law." (citation, internal quotation marks, and

alteration omitted)).

---

[3] Even under the FAA, "[w]hether parties have obligated themselves to arbitrate certain issues, including the question of arbitrability, is determined by state law."  *See Shaw Grp. Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 120 (2d Cir. 2003).  However, where the FAA applies, "certain [federal] presumptions inform the analysis."  *Id.*

**B.      The Parties Have Evinced a Clear and Unmistakable Agreement to Arbitrate Arbitrability**

Federal and New York law alike recognize both the "well settled proposition that the question of arbitrability is an issue generally for judicial determination" and the "important legal and practical exception" that applies when parties "evince a clear and unmistakable agreement to arbitrate arbitrability." *Shaw*, 322 F.3d at 121 (internal quotation marks omitted) (quoting *Smith Barney Shearson Inc. v. Sacharow*, 91 N.Y.2d 39, 45–46 (1997)); *see also id.* at 124 ("[F]ederal and New York law both follow the same principles when deciding whether the parties to an arbitration agreement have clearly and unmistakably indicated an intent to arbitrate arbitrability.").

The Second Circuit has identified

certain principles of New York contract law relevant to determining whether an arbitration agreement clearly and unmistakably demonstrates that arbitrators rather than the courts are to resolve questions of arbitrability: (1) "[i]n interpreting a contract, the intent of the parties governs;" (2) "[a] contract should be construed so as to give full meaning and effect to all of its provisions;" (3) words and phrases in a contract should be "given their plain meaning;" and (4) ambiguous language should be construed against the interest of the drafting party.

*Id.* at 121 (citation omitted).

The Court concludes that the parties have evinced a clear and unmistakable agreement to arbitrate arbitrability in several ways.  First, by its terms, the arbitration clause at issue in § 19 of the 2006 agreement submits "*all* claims, disputes and other matters in question arising out of, or relating to, this letter agreement or the performance thereof" to binding arbitration.  Dkt. No. 7-3 § 19 (emphasis added); *see also* Shaw, 322 F.3d at 121 ("[W]e held that . . . a referral of 'any and all' controversies reflects such a broad grant of power to the arbitrators as to evidence the parties' clear intent to arbitrate issues of arbitrability." (internal quotation marks and alteration omitted)).  Moreover, this clause specifically provides that the question of  "whether a matter is

7

governed by this arbitration clause" is expressly committed to binding arbitration.  *Id.*  Thus, this agreement both "delegate[s] arbitrability expressly," and "include[s] the word[] . . . 'all,'" which "further support[s] the broad authority of the arbitrator."  *Olsen v. Charter Commc'ns, Inc.*, No. 18-cv-3388 (JGK), 2019 WL 3779190, at *7 (S.D.N.Y. Aug. 9, 2019).

Second, the parties' intent to arbitrate arbitrability is further evinced by the arbitration clause's incorporation of the rules of the American Arbitration Association, which apply to the binding arbitrations conducted pursuant to § 19.  Rule 7(a) of the AAA's rules provides that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement," American Arbitration Association, Commercial Arbitration Rule 7(a), and the Second Circuit has "squarely held that adopting the AAA's Commercial Arbitration Rules constitutes clear and unmistakable evidence of the parties' intent to arbitrate issues of arbitrability," *WTA Tour, Inc. v. Super Slam Ltd.*, 339 F. Supp. 3d 390, 402 (S.D.N.Y. 2018); *see Contec Corp. v. Remote Solution, Co., Ltd.*, 398 F.3d 205, 208 (2d Cir. 2005).  Accordingly, § 19's adoption of the AAA's rules further manifests the parties' clear and unmistakable agreement to arbitrate the question of arbitrability.

### C.    Plaintiffs' Arguments to the Contrary are Unavailing

While Plaintiffs argue that the 2006 agreement does not clearly and unmistakably evince an agreement to arbitrate arbitrability, all of their arguments to this effect are unavailing.

First, they point to various provisions of the 2006 agreement that, they argue, envision a role for this Court in adjudicating disputes.  These provisions include the choice of law clause, *see* Dkt. No. 7-3 § 11, and the exclusive jurisdiction clause, *see id.* § 12.  As an initial matter, all these provisions make clear that resort to the courts should be had only where arbitration is *unavailable*.  *See id.* § 11 (providing that trial by jury is waived in the event that "arbitration

pursuant to Section 19 . . . is not available)"; *see id.* § 12 (providing that "*all* disputes in the first instance will be resolved in accordance with Section 19," and the exclusive jurisdiction clause applies only "in the event that arbitration is not available pursuant to Section 19" (emphasis added)).  Far from evincing an intent *not* to arbitrate questions of arbitrability, these provisions further cement the parties' intent to arbitrate *all* disputes in the first instance.  *See id.* § 12.

Plaintiffs also point to the arbitration clause itself, *see id.* § 19—which they argue is "permissive"—as undermining any clear and unmistakable agreement to arbitrate all disputes, including arbitrability.[4]  This argument is, in essence, a challenge not to whether the parties agreed to arbitrate arbitrability, but rather whether they agreed to arbitrate at all.  Plaintiffs premise this argument on the language of § 19, which provides that the parties "may" submit disputes to binding arbitration.  *See id.*  Thus, under the 2006 agreement, they argue, arbitration is *permitted* but not *required.*  *See* Dkt. No. 34 at 2.  This argument fails for several reasons. First, the "overwhelming balance of authority in this [C]ircuit and elsewhere indicates that, absent some separate suggestion that an Arbitration Provision is intended to trigger permissive arbitration, provisions with the word 'may' trigger mandatory arbitration."  *Travelport*, 2012 WL 3925856, at *4.  Though some, or perhaps many, of these cases may have involved agreements governed by the FAA, the Court finds the overwhelming weight of this authority persuasive nonetheless.  Moreover, if § 19 were to be interpreted as entirely permissive, such an interpretation would beg the question of why the parties bothered to include it.  "After all, parties can always submit a dispute to arbitration if both consent."  *Id.*

---

[4] "'Mandatory' arbitration requires arbitration if either of the parties elects to pursue it; 'permissive' arbitration requires arbitration only with the consent of both parties."  *Travelport Glob. Distribution Sys. B.V. v. Bellview Airlines Ltd.*, No. 12-cv-3483 (DLC), 2012 WL 3925856, at *3 n.2 (S.D.N.Y. Sept. 10, 2012).

Even where courts have concluded that arbitration clauses that provide that parties "may" submit disputes to binding arbitration are permissive, they have done so only in a limited sense. Indeed, courts to have found that such clauses have some permissive aspect still conclude that they require "arbitration if the provision [is] invoked by either party." *Travelport*, 2012 WL 3925856, at *4 (citing *Chiarella v. Vetta Sports, Inc.*, No. 94-cv-5933 (PKL), 1994 WL 557114 (S.D.N.Y. Oct. 7, 1994)); *see also Neisloss v. Gomez Assocs., Inc.*, 16 Misc. 3d 1141(A), at *2 (Sup. Ct. Nassau Cty. 2007) (finding that a "permissive" arbitration clause provided a "contractual right [for] either or both parties to seek to resolve their dispute through arbitration"). In other words, under such an interpretation, "[t]he only permissive aspect of the agreement is that which affords either party the opportunity to initiate arbitration." *Egol v. Egol*, 118 A.D.2d 76, 79 (1st Dep't 1986), *aff'd*, 68 N.Y.2d 893.  Once either party initiates arbitration, both parties must arbitrate the dispute.  Again, to conclude otherwise would render the arbitration clause meaningless. *New York Cross Harbor R.R. Terminal Corp. v. Consol. Rail Corp.*, 72 F. Supp. 2d 70, 77 (E.D.N.Y. 1998) ("Because parties may always agree to arbitrate a dispute, to interpret an arbitration agreement that uses the term "may" as permitting rather than mandating arbitration would violate the age-old principle that contracts must not be interpreted so as to render clauses superfluous or meaningless.").  Thus, even if under § 19 arbitration is not mandatory in *every* instance, it is, at a minimum, mandatory in *this* instance, where Defendants have initiated arbitration.[5]

Plaintiffs further point to the final sentence of § 19 as evincing the parties' clear and unmistakable intent *not* to arbitrate arbitrability.  This sentence provides that § 19 "shall not be

---

[5] While the Court need not decide whether § 19 is "mandatory" or "permissive" in some limited sense because it concludes arbitration is mandatory here, it notes that interpreting the clause as permissive in the limited sense articulated above would further explain why the 2006 agreement contains jury waiver and exclusive jurisdiction provisions.  *See* Dkt. No. 7-3 §§ 11, 12.

interpreted to preclude the right of a member to obtain equitable relief to enforce his, her or its

rights under this agreement either in a court of competent jurisdiction or in an arbitration

proceeding pursuant to this" section.  Dkt. No. 7-3 § 19.  This argument is unavailing, because

this sentence allows the parties to apply to this Court for equitable *relief*, but does not anywhere

entitle them to have equitable *claims* heard by this Court as opposed to an arbitrator.  *See Bolden*,

2019 WL 2119622, at *5.  Moreover, this sentence does not overcome the clear and

unmistakable agreement to arbitrate "all claims, disputes and other matters"—capacious

language that encompasses disputes regarding arbitrability—that is evinced earlier in this same

section.  *See id.*; Dkt. No. 7-3 § 19.

Finally, Plaintiffs argue that where, as here, an agreement includes a choice of law clause

that provides that the " agreement *and its enforcement* shall be governed by New York law,

arbitrability questions must be decided in a New York court."  Dkt. No. 7-1 at 6.  In other words,

they argue, such choice of law clauses incorporate "substantive principles that New York courts

would apply"—or New York contract law—*and* "special rules limiting the authority of

arbitrators"—or New York arbitration law.  *Smith Barney Shearson*, 91 N.Y.2d at 49 (quoting

*Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 64 (1995)).  One such special rule

is that "statutory time limitations questions" and questions of arbitrability "are for the courts, not

the arbitrators."  *Id.* at 48; *see also PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1200 (2d Cir.

1996) ("New York law generally reserves issues of timeliness and arbitrability for the courts.");

*Smith Barney, Harris Upham & Co. v. Luckie*, 85 N.Y.2d 193, 202 (1995).

Here, again, they are mistaken.  Plaintiffs' argument relies heavily on the New York

Court of Appeals' decision in *Luckie*.  However, subsequent New York Court of Appeals

authority has clarified that *Luckie* did not place any limits on parties' abilities to "freely

contract[] to submit every part of their disputes to arbitration," and the analysis remains centered around what disputes the parties have agreed to submit to arbitration. *See Sacharow*, 91 N.Y.2d at 48. The Court concludes that the general language regarding enforcement in the choice of law clause does not overcome the clear and unmistakable agreement in § 19 to arbitrate *all* disputes, "*including questions as to whether a matter is governed by this arbitration clause*." *Cf. Coleman & Co. Securities, Inc. v. Giaquinto Family Trust*, No. 00-cv-1632, 2000 WL 1683450, at *3 (S.D.N.Y. Nov. 9, 2000) (Chin, J.) (holding that provision for "agreement and its enforcement" to be governed by New York law did not evince parties' intent to be bound by New York arbitration law). Not only is there ample evidence, articulated above, of the parties' clear and unmistakable agreement to arbitrate all disputes—including arbitrability—but also all of the cases Plaintiffs cite in support of its argument that the choice of law clause here places restrictions on the scope of the authority of the arbitrator are distinguishable. Indeed, none involved arbitration clauses, like that at issue here, that *explicitly* submitted arbitrability disputes to arbitration.

*   *   *   *   *

In sum, the 2006 agreement evinces a clear and unmistakable agreement between the parties to submit *all* disputes—including those involving questions of arbitrability—to the arbitrator, Plaintiffs' arguments to the contrary notwithstanding. This conclusion is bolstered by the "long and strong public policy favoring arbitration" that prevails in New York, as well as the role that arbitration plays in "conserving the time and resources of the courts and the contracting parties." Mindful of this policy, the Court heeds the New York Court of Appeals' admonition that "courts [should] interfere 'as little as possible with the freedom of consenting parties' to submit disputes to arbitration." *Sacharow*, 91 N.Y.2d at 49–50.

12

Accordingly, because Plaintiffs are unable to demonstrate *any* likelihood of success in this Court on the merits on their claims, their preliminary injunction motion is DENIED.  The Court need not resolve any of the other arguments Plaintiffs advance in their preliminary injunction motion.  All of these arguments—regarding Crossbeam's capacity to be sued, whether the statutes of limitations have run on Defendants' claims, and whether Defendants' claims do, in fact, arise out of the 2006 agreement—are, in accord with the foregoing, appropriately resolved by the arbitrator.  *See Olsen*, 2019 WL 3779190, at *8 ("Given this broad delegation, the plaintiffs' remaining arguments concerning arbitrability are for the arbitrator to decide."); *WTA Tour*, 339 F. Supp. 3d at 402 ("Any remaining questions about the scope of arbitrability must be resolved by the arbitrator.").

## IV.    CONCLUSION

Plaintiffs' preliminary injunction motion is DENIED.  Within seven days of the date of this Opinion and Order, Plaintiffs shall inform the Court whether, in light of this ruling, they contemplate any further proceedings in this Court.

SO ORDERED.

Dated: May 31, 2020
       New York, New York

_____
        ALISON J. NATHAN
     United States District Judge

13